KUHN, J.
14Plaintiffs-appellants, Leslie Dillon and his major children, April and Matthew, (collectively the Dillons), appeal the trial court’s judgment entered in conformity with a jury verdict awarding $5,225.00 in general and special damages to Leslie Dillon against defendants, Vulcan Materials Company (Vulcan) and Industrial Coating Contractors, Inc. (ICC) for his exposure to a chemical release, which occurred at the Vulcan plant in Geismar, Louisiana. Because we conclude the trial court erred by requiring the Dillons to use the same jury used in previous consolidated cases arising out of the same chemical release, we vacate the judgment and remand the case for a new trial.
FACTUAL AND PROCEDURAL BACKGROUND
On April 3, 2001, a chemical release occurred at the Vulcan plant in Geismar, Louisiana.[1] A Shell Chemicals facility, located adjacent to the Vulcan plant, was downwind of the chemical release. Plaintiff, Leslie Dillon, was working as a pipe welder on the Shell Chemicals premises at the time of the release.[2] After the release, over 3,000 claims were filed against defendants Vulcan and ICC.[3] The Dillons’ *5 claims were included in the suit entitled Able v. Vulcan Materials Co., docket number 72,084, which was filed on April 3, 2002.
During the pre-trial process, the trial judge granted a joint motion that consolidated all of the April 3, 2001 chemical release cases for pre-trial | ¡¡proceedings into a single litigation entitled In Re: Vulcan Litigation, April 2001 Incidents. Additionally, a steering committee was created to lead the plaintiffs’ litigation. Daniel Becnel, Jr. and Robert Schmolke were designated as the co-lead counsel for the plaintiffs.
In December of 2003, the court approved a trial procedure wherein the claims of ten plaintiffs would be presented in the first trial, with the plaintiffs and defendants each selecting five plaintiffs. Pursuant to the approved procedure, the jury would hear testimony related to the event to decide fault and then would decide medical causation and individual damages for those first ten plaintiffs. Thereafter, the causation and damage claims of the remaining plaintiffs would be tried in subsequent trials if settlements were not reached. The Dillons acknowledge that the co-lead counsel for plaintiffs entered into a stipulation agreeing to use the same jury for the consolidated cases. A status conference in October of 2002 shows that it was plaintiffs’ co-lead counsel who suggested the use of the same jury for all subsequent plaintiffs.
Before the first trial, Vulcan and ICC stipulated to their respective percentages of fault. Five plaintiffs stipulated that their damages did not exceed $50,000.00. Those claims were heard by the trial judge alongside those presented to the jury.[4]
The trial began on July 6, 2004, and took 18 days to try (“the McLeon trial”). Due to voluntary dismissals and a settlement, only four claims were submitted to the jury and one to the trial judge. During the voir dire, the trial | ¿judge permitted both the attorneys for defendants and attorneys for those plaintiffs to question the potential jurors. Throughout the trial, there was excessive attorney commentary, generally involving the defense counsels’ persistent characterization of the litigation as a “money grab” orchestrated by plaintiffs’ attorneys and the plaintiffs’ co-lead counsel’s repeated use of inappropriate inflammatory commentary.[5] The jury also *6 heard commentary during opening statements about certain judge-trial plaintiffs who voluntarily dismissed their claims before the trial even concluded.[6]
|7On August 17, 2004, the jury rendered verdicts and awarded damages as follows: (1) Robert Noland, $16,646.12; (2) James Penton, $29,557.00; (3) Sheila Piper, $13,500.00; and (4) Ronnie Vallery, $138,972.00.[7] The trial court entered a judgment in conformity with the jury verdict and awarded plaintiff, Benjamin Our-so, $3,042.10. The trial court’s judgment was affirmed on appeal. See McLeon v. Vulcan Chemicals, 2006-0662 (La.App. 1st Cir.9/14/07), 2007 WL 2684987 (unpublished), writ denied, 2007-2250 (La.1/25/08), 973 So.2d 757.
As the trial of the second set of ten plaintiffs commenced, plaintiffs’ co-lead counsel filed an expedited writ, asserting that the trial court had abused its discretion when it re-seated the jury from the first trial because more than two years had elapsed since the first trial. This court denied the writ “on the showing made.” See In re: Vulcan Litigation-April, 2001 Incidents, 2006-2504 (La.App. 1st Cir.1/5/07) (unpublished writ action). Thereafter, all the remaining parties reached a settlement agreement with the exception of the Dillons. The trial court 1 ¿permitted the Dillons to “opt out” of the settlement and to pursue their claims in a stand-alone case. In its January 18, 2008 response to plaintiffs’ motion for leave to amend their lawsuit to add April and Matthew Dillon as party plaintiffs (to personally assert their claims upon reaching the age of majority), Vulcan not only agreed that the Dillons “timely and properly opted-out,” but also agreed to the amendment *7 of the pleadings to add new and additional named plaintiffs. Furthermore, in the January 18, 2008 response, Vulcan clearly acknowledged that the Dillons were not included in any settlement class. The defendants have therefore acquiesced in the fact that the plaintiffs, by “opting-out,” are not bound by any agreement amongst the defendants and the plaintiffs in the “settlement class.”
After opting out of the settlement, the Dillons retained new counsel and filed an amended complaint on November 13, 2007. Leslie Dillon averred that his exposure caused injuries including insomnia, reduced lung function, heat intolerance, headaches, depression, and anxiety. His doctor declared him disabled from work in 2002. April and Matthew averred that their father’s condition had negatively impacted their society and companionship with him.[8]
In December of 2008, the trial judge ordered that the jury chosen for the consolidated litigation appear before the court on March 23, 2009, to ascertain whether they were still eligible and available to serve. On March 18, 2009, the Dillons filed a motion for a new jury. The motion averred in pertinent part:
2.
Initially class counsel made an agreement with defendants to use the same jury in multiple trials arising from the Vulcan litigation.
19^-
Dillon was never aware of, advised, nor consulted about such procedure and did not agree.
4.
In the ensuing years, the case has settled in the community and it is highly unlikely that the prior jurors are not aware of these settlements.
5.
The purpose of using the same jury stated at the time of the agreement was to assist in settling the case. That goal was accomplished and is no longer a justification.
6.
At the time the second Vulcan group was slated to be tried, the court brought in the original jury. Several expressed great reluctance to serve again and counsel’s memory is that the foreman was frustrated and rebellious about having to be placed in such a position. None of that was the fault of, nor due to anything done by Mr. Dillon.
7.
In the case tried, the original jury was exposed to very prejudicial evidence irrelevant to the Dillon case, but very relevant to the Vulcan defense. This evidence included:
(a) Evidence of people who were making judge trial claims that had cases of such questionable merit that they-were dismissed on the second day of trial. However the jury was exposed to these questionable and prejudicial claims.
(b) Lead counsel for the class advised the jury in opening statement that his case was settled and that he had no dog in the hunt....
(c) The defendants were able to argue without objection that the plaintiffs counsel involved in the first trial were engaged in a “money grab” and that the case itself in terms of damages was exaggerated and lawyer created.
The plaintiffs, therefore, asserted that use of the same jury would violate their fundamental right to a fair and impartial jury. *8 The motion was scheduled to be heard on March 23, 2009, on the same day that the trial judge was to meet with the jurors from the consolidated litigation.
|10On the morning of March 23, 2009, the trial judge informed the attorneys that he intended to interview each juror individually with the attorneys present and to ask them whether they still lived in the parish, whether they found out anything about the case, and whether they could still be fair. The attorneys were not permitted to ask any questions, but could give specific questions to the trial judge to ask. During the interviews, five of the twelve jurors indicated they had heard discussions of a Vulcan settlement since the first trial. One of those five heard that a plaintiff “refused to settle.” Another juror indicated that she had moved out of the parish. The parties agreed to “waive” this impediment. When the plaintiffs’ counsel expressed concern about the responses of some of the jurors, the trial judge instructed counsel to make his argument after the completion of the juror interviews. None of the jurors were dismissed. After the juror interviews, the trial judge heard arguments on the motion for a new jury and issued a ruling denying the motion.
Immediately prior to trial, the trial judge met with the jurors again. He began by informing them of the anticipated dates of the trial and asking whether “anyone [has] any problem with that, think that will be a difficulty or a hardship on you in this case?” Three jurors responded that it would; no jurors were dismissed. The trial judge then instructed each juror to introduce themselves to the attorneys and then he introduced the plaintiffs and their counsel to the jury, asking whether anyone on the jury knew them. Then the trial judge asked:
Since you’ve been recessed from that first trial have any of you heard anything more or learned any more information, acquired any knowledge about anything involving this case since our last trial? Read anything about it? Heard anything about it? Anything like that?
|nAny of you know of any reason why you can’t be a fair and just juror for this particular plaintiff in this trial?
After a discussion with one juror who asked whether his job might create a conflict of interest, the trial judge proceeded to give the jury instructions.
The Dillons’ five-day trial began in January of 2010, more than five years after the first trial in the Vulcan consolidated cases. The defendants stipulated their liability for the release and admitted that the released chemicals can cause “adverse health effects.” Although the parties agreed that the plume had passed over the Shell Chemicals plant, they disputed whether the plume had passed over Leslie Dillon’s particular location at the plant and whether he had been otherwise exposed to the chemicals that day. After the presentation of evidence, the jury found there was medical causation but awarded Leslie Dillon only $5,225.00 in damages.[9] The jury did not award any damages to either April or Matthew for their respective losses of consortium. The trial judge signed a judgment in conformity with the jury’s verdict that the Dillons now appeal.
DISCUSSION
The Dillons assert that the trial court violated their fundamental right to a fair and impartial jury by requiring them to *9 use the same jury that was utilized for the trials in the consolidated litigation. The Dillons urge that the length of time that elapsed since the first trial, the jury’s exposure to prejudicial evidence irrelevant to their case but relevant to the defense’s strategy, and the fact that their suit is separate and distinct from the consolidated litigation all weigh in favor of | ^allowing their claims to be heard before a new jury.
The issue of whether the Dillons’ right to a fair and impartial jury was violated by the trial judge’s decision to utilize the same jury from the consolidated case is a question of law. Appellate review of questions of law is simply a review of whether the trial court was legally correct or legally incorrect. Hidalgo v. Wilson Certified Express, Inc., 94-1322 (La.App. 1st Cir.5/14/96), 676 So.2d 114, 116. On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and render judgment on the record. In re Mashburn Marital Trust, 2004-1678 (La.App. 1st Cir.12/29/05), 924 So.2d 242, 246, writ denied, 2006-1034 (La.9/22/06), 937 So.2d 384.
There is a statutory right to a trial by jury in civil cases. See La. C.C.P. art. 1731. Article 1731 states in pertinent part that, “[ejxcept as limited by Article 1732, the right of trial by jury is recognized.” (Emphasis added.) The Official Revision Comments to Article 1731 further emphasize the inviolate nature of this right, stating:
This article serves the same purpose as Fed. Rule 38(a), which provides that the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate.
The jurisprudence also establishes that the right of a litigant to jury trial is fundamental in character, and the courts will indulge every presumption against a waiver, loss, or forfeiture thereof. Champagne v. Am. S. Ins. Co., 295 So.2d 437, 439 (La.1974), (citing Hicks v. Bd. of Supervisors of Louisiana State University, 166 So.2d 279 (La.App. 1st Cir.1964); Arrington v. McCarty, 136 So.2d 119 (La.App. 3d Cir.1961), and Abercrombie v. Gilfoil, 205 So.2d 461 (La.App. 1st Cir.1967)). The Louisiana Supreme Court recently reaffirmed the right to a jury trial in a civil case, noting that the right is “favored in the law.” Pugeau v. Hebert, 2000-0875 (La.5/12/00), 760 So.2d 325, 326. This right inures to the benefit of both plaintiffs and defendants.
Justice Marshall wrote that the great value of a trial by jury lies in its fairness and impartiality. United States v. Burr, 25 F.Cas. 49, 50 (Circuit Court D. Virginia 1807). A jury should enter upon the trial with minds open to those impressions which the testimony and the law of the case ought to make, not with preconceived opinions which will resist those impressions. Id. More recently, the United States Supreme Court has stated that among the basic fair trial rights that can never be treated as harmless is the right to an impartial adjudicator, whether judge or jury. Gomez v. United States, 490 U.S. 858, 876, 109 S.Ct. 2237, 2248, 104 L.Ed.2d 923 (1989). Indeed, the Louisiana Code of Civil Procedure recognizes the importance of a jury’s impartiality, permitting a juror to be challenged for cause, “[w]hen the juror has formed an opinion in the case or is not otherwise impartial, the cause of his bias being immaterial.” La. C.C.P. art. 1765. Safeguards of juror impartiality include voir dire and protective instructions from the trial judge. Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).
*10 The purpose of voir dire is to discover grounds for challenges for cause and to secure information for the intelligent exercise of peremptory challenges. State v. Mickey, 626 So.2d 24, 26 (La.App. 1st Cir.1993). The two basic reasons to challenge for cause are for a lack of impartiality or a lack of qualifications. 11 uFrank L. Maraist, Louisiana Civil Law Treatise, Civil Procedure § 11:4 (2008). In civil cases, “[t]he parties or their attorneys shall individually conduct such examination of prospective jurors as each party deems necessary,” although the court may control the scope of their examination. La. C.C.P. art. 1763(B).
The qualification requirements for jurors in civil cases are governed by those standards set forth in the Code of Criminal Procedure. La. R.S. 13:3041(B) and 1 Frank L. Maraist, Louisiana Civil Law Treatise, Civil Procedure § 11:4 (2008). Louisiana Code of Criminal Procedure article 401 provides in pertinent part:
A. In order to qualify to serve as a juror, a person must:
(1) Be a citizen of the United States and of this state who has resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service. [Emphasis added.]
Based on the particular facts of this case and our review of the law, we find that this jury was improperly constituted and its use violated the Dillons’ fundamental right to a fair and impartial jury.
First, it was improper to use a juror who resided outside of Ascension Parish, the parish where the trial was conducted. Article 401 requires that each juror must be a resident of the parish where she will serve. Prior to the commencement of the Dillons’ trial, a prospective juror advised the court that she did not reside in Ascension Parish. While the attorneys may have stipulated their agreement to the juror’s use, a stipulation is only binding if it is not in derogation of the law. See Triche v. Allstate Ins. Co., 96-0575 (La.App. 1st Cir.12/20/96), 686 So.2d 127, 131. We conclude that the parties could not waive the residency | ^requirement by agreement where the court had notice of the issue prior to the commencement of the trial. See La. C.Cr.P. art. 401.
Second, the voir dire employed for the Dillons’ trial substantiated the plaintiffs’ concerns that certain members of the jury were no longer impartial. During the trial judge’s interview of the jurors, several indicated that they had observed media coverage regarding a Vulcan settlement. One juror heard there was a plaintiff who “refused to settle.” These statements confirm some of the concerns raised by the plaintiffs in their motion.
Furthermore, the trial judge did not permit counsel to conduct their own examination of the jurors as required by La. C.C.P. art. 1763. While the jury was properly vetted through voir dire for the McLeon trial, that vetting did not guarantee the jurors’ impartiality for the Dillons’ trial. There was a particular need for an adequate voir dire in this case given the excessive commentary that occurred throughout the McLeon trial, the media coverage of the settlement that occurred subsequent to the McLeon trial, and the fact that more than five years had elapsed since the first trial. The curtailing of the voir dire prevented the parties from obtaining additional evidence regarding the jurors’ impartiality and, therefore, was especially egregious. We also observe that the trial judge failed to summon any additional prospective jurors and he did not take any other definitive steps to provide *11 for the not unlikely event that a juror from the McLeon trial was no longer qualified.
Defendants assert that the motion for a new jury was properly denied, emphasizing in particular the stipulated agreement of the co-lead counsel agreeing to use the same jury for all the consolidated cases. However, we note that the 11f,Dillons were permitted to opt out of the settlement and to bring their own stand-alone case. Therefore, they were allowed to and did in fact remove themselves from the earlier procedural agreements applicable to the consolidated cases. April and Matthew Dillon, new plaintiffs to the litigation, were not able to participate in the procedure established and have been totally denied an opportunity for a jury trial on their respective claims. Neither the Dillons nor their counsel could acquiesce to this procedure because it was an invalid procedure. A stipulation is binding only if it is not in derogation of the law. Triche, 686 So.2d at 131. While the stipulation among counsel may not have been inherently in derogation of the law, its efficacy is called into question here because it has the effect of sacrificing a party’s basic right to a fair and impartial jury.
During oral arguments, the defendants’ counsel also asserted that the plaintiffs waived their right to appeal the use of this jury by failing to seek supervisory review on the issue prior to trial, citing several cases in support. See Luquette v. Decker, 273 So.2d 570 (La.App. 1 Cir.1973), writ denied, 276 So.2d 702 (La.1973); Holmes v. Peoples State Bank, 796 So.2d 176 (La.App. 2d Cir.2001), writ denied, 808 So.2d 342 (La.2002), cert denied 537 U.S. 897, 123 S.Ct. 197, 154 L.Ed.2d 167 (2002); Gamble v. D.W. Jessen & Associates, 491 So.2d 483 (La.App. 3d Cir.1986), remanded on other grounds, 496 So.2d 319 (La.1986); Windham v. Security Insurance Company of Hartford 337 So.2d 577 (La.App. 4th Cir.1976), writ denied, 341 So.2d 407 (La.1977); and Brown v. General Motors Corp., 662 So.2d 531 (La.App. 5th Cir. 1995), writ denied, 667 So.2d 1055 (La.1996). However, these cases only involved a trial court’s decision to allow or to disallow a trial by jury. None involved the qualifications or | ^impartiality of the jurors themselves. In a case closer to that before us, the Louisiana Supreme Court held that a Batson/Edmondson challenge in a civil case may be reviewed by an intermediate appellate court on appeal. See Alex v. Rayne Concrete Serv., 2005-1457 (La.1/26/07), 951 So.2d 138, 146. Additionally, the Louisiana Supreme Court acknowledged therein that challenges for cause in civil cases are routinely reviewed on appeal. Id. Given the foregoing, we reject the notion that the Dillons have waived their right to appeal the use of this jury. This is underscored by the facts that the amendment agreed to by Vulcan in its January 18, 2008 response to plaintiffs motion for leave to amend their petition brought in new plaintiffs whose claims have never been presented to a jury, and that with the amendment agreed to by the defendants, the specifics of the claim asserted by the Dillons was changed.
Finally, the defense urges an application of the law-of-the-case doctrine. However, this principle is not applied to prevent a higher court from considering the correctness of a ruling. State v. Langley, 2006-1041 (La.5/22/07), 958 So.2d 1160, 1163, cert, denied, 552 U.S. 1007, 128 S.Ct. 493, 169 L.Ed.2d 368 (2007). Accordingly, we find that under the facts of this case, the use of this jury violated the Dillons’ right to a fair and impartial jury.
We additionally point out that the right to a jury is not preempted by this court’s power to review de novo. In the case before us, the Dillons never possessed a properly constituted jury because the *12 jury was tainted from the inception of their trial both by the improper stipulation that attempted to sacrifice the parties’ basic rights to a fair and impartial jury and the seating of an unqualified juror. These errors impacted the entire framework of the trial from |1Rbeginning to end. See State v. Langley, 958 So.2d at 1168. Where there is a complete record, appellate courts will generally review the record without according any deference to the trial court and will render judgment on the merits based on the de novo review of the record, rather than remanding the case for a new trial. See 1 Frank L. Maraist, Louisiana Civil Law Treatise, Civil Procedure § 14:15 (2008) and Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (1975). This court has previously noted, however, that Gonzales did not deal with a situation where the jury was improperly constituted. Nettles v. Bowlin, 417 So.2d 1192, 1198 (La.App. 1st Cir.), (on rehearing), writs denied, 422 So.2d 416, 417 (La.1982).
Where a jury is improperly constituted, the basic right to a fair jury trial requires remand. Nettles, 417 So.2d at 1198. An appellate court is empowered by La. C.C.P. art. 2164[10] to remand a case where it is necessary to reach a just decision and to prevent a miscarriage of justice. See Alex, 951 So.2d at 155. Whether or not any particular case should be remanded is a matter which is vested largely within the court’s discretion and depends upon the circumstances of the case. Id. However, considerations of judicial economy must yield to the greater legal principles involved. Id. at 156.
Moreover, in civil law jurisdictions such as ours, legislation is the superior source of law. See La. Civ.Code art. 1, comment (a). Legislation is the solemn expression of legislative will. La. Civ.Code art. 2. Custom may not abrogate legislation. La. Civ.Code art. 3.
|1flThe legislation implicated herein is the statutory right to a trial by jury given the improperly constituted jury. See La. C.C.P. art. 1731. In contrast, de novo review originated in the jurisprudence. See 1 Frank L. Maraist, Louisiana Civil Law Treatise, Civil Procedure § 14:15 (2008) and Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (1975). Accordingly, this court’s power to review de novo cannot preempt the Dillons’ fundamental right to a jury. Finally, remand of this case will serve not only to protect the Dillons’ right to a fair jury, but also to protect the defendants’ right to trial by jury. For these reasons, this matter is remanded to the trial court for a new trial.
DECREE
The trial court’s January 21, 2010 judgment is vacated, and the case is remanded for a new trial with selection of a new jury in accordance with these principles.[11] Appeal costs are assessed one-half to plaintiffs-appellants, Leslie, April and Mathew Dillon, and one-half to defendants-appel-lees, Vulcan Materials Company and Industrial Coating Contractors, Inc.
VACATED AND REMANDED.
WHIPPLE, J., concurs in the result.
GUIDRY, J., dissents and assigns reasons.

.The following chemicals were released from Vulcan’s chloromethanes unit: hydrogen chloride, methyl chloride, methylene chloride, chloroform, and carbon tetrachloride. The parties dispute whether chlorine was released.

. Leslie Dillon was an employee of Shaw Constructors, Inc. at the time of the release.

. International Maintenance Corporation was also named as a defendant, but was subsequently dismissed with prejudice in February of 2004.

. See In re Vulcan Litigation-April 2001 Incidents, 2004-1486 (La.App. 1st Cir.7/2/04) (unpublished writ action).

. During his opening statement, defense counsel stated:
As we’ve already discussed, we now have 3,500 plaintiffs. And as I said earlier, we’ve been working on this case since the very day it happened. Because within the first four hours after this release happened, one of the lawyers, Ms. Grodner, who is here with her partner, Ms. Vinet, filed a lawsuit here in Judge Tureau’s court, within four hours, where she had gotten a bunch of people together to claim permanent injury and to file a lawsuit here within four hours. Within a couple of days of that, another of the plaintiffs’ lawyers, Mr. Ike Hawkins, who you met earlier, held a meeting over at the Cracker Barrel on I — 10. Plaintiff counsel objected. Plaintiffs’ co-lead counsel commented to one of the plaintiffs' witnesses: "Chlorine has been used in both World War I and by Saddam Hussein to gas thousands of people.” Defense counsel objected and requested a mistrial. During his cross-examination of one of the plaintiffs’ witnesses, defense counsel asked: “Isn’t it in fact true, doctor, that Mr. Noland was doing just fine psychiatrically until he was sent to Dr. Shamsnia, Nathan, Joyner, Brautbar and yourself, by Mr. Becnel?” During his cross-examination of a plaintiff, defense counsel asked: "Did you sign up with [Becnel] at this meeting he had at the Cracker Barrel restaurant?” The plaintiff responded, "No, sir.” Defense counsel then asked: "You knew other people that went to that meeting?” Plaintiffs' counsel objected and defense counsel withdrew the question. During his cross exami *6 nation of one of the defense's witnesses, plaintiffs' co-lead counsel commented: "In fact, when a number of my clients were killed at the Exxon Refinery, you represented Kean Miller and Exxon in that case where the whole neighborhood was inundated from that explosion and fire that lasted days." Defense counsel objected and stated, "[hje's misstating the evidence. He knows that the plume went in the opposite direction of his clients." During his closing argument, defense counsel stated, "You can say with your verdict that this is not reasonable and fair compensation. This is a money grab. That's what it is. That's what they’re trying to do.”

. During his opening statement, defense counsel described the claims of some of the plaintiffs whose claims were to be tried by the trial judge: "Ms. Moore is 24. She’s single with no children. She arrived at the Tánger Outlet Mall, which is not even in the path of the plume, two to four hours after the release. Didn't even hear about the release until the next day, and she filed a claim.... Ms. Feli-ta Wright is 30. She's single. She’s located on the map. She was not in the exposure zone. She had no dose. She saw no doctors .... Mr. McMillian was west of the railroad tracks_ Well, Mr. McMillian has given sworn testimony.... He testified quite clearly that he was not Kurt. He sought no medical treatment; that he was fine. He was honest enough to tell me anyone who was not hurt should not get an award of money."

. The four plaintiffs with jury claims were in the following locations at the time of the release and averred the following injuries:
a. Ronnie Vallery: at the Vulcan plant, asserting that he suffered from dry eye syndrome, conjunctivitis, continuous sinus complaints including congestion, postnasal drip, and headaches, twisted knee and ankle, and memory problems.
b. Sheila Piper: at the Shell plant, asserting she suffered chronic bronchitis, asthma, congestion, postnasal drip, vomiting, nausea, exacerbation of her gastrointestinal complaints, and heartburn.
c. James Penton: at the Shell plant, asserting he suffered chemical-induced bronchitis, shortness of breath, dry eye syndrome, congestion, edema, postnasal drip, headaches, erectile dysfunction, anxiety, and depression.
d. Robert Noland: at the Shell plant, asserting that he suffered from sinusitis, reactive upper-airways dysfunction syndrome, headaches, nosebleeds, neurological sleep problems, and depression.

. In the amended petition, April and Matthew Dillon were added as party plaintiffs to personally assert their loss of consortium claims as they had reached the age of majority.

. The damages awarded to Leslie Dillon were allocated as follows: $1,725.00 for past medical expenses, $1,000.00 for past lost wages, and $2,500.00 for past and future mental anguish, fear and fright, stress, inconvenience and loss of enjoyment of life.

. Louisiana Code of Civil Procedure article 2164 states in pertinent part, "The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.”

. In light of our disposition, vacating the trial court's judgment rendered in conformity with the illegally constituted jury, we preter-mit discussions of the remaining assignments of error, challenging the quantum of damages.